WILLIAM A. DRIVER

*v.*

ANNIE DRIVER.

Where a husband apparently acquiesced in his wife's return to her father's house to live, visited her while there, and furnished her money for her support while thus living apart from him, and never demanded that she should return to live with him, *Held*, that he was not entitled to a divorce for desertion.

Petition for divorce on the ground of desertion. On final hearing on pleadings and proofs.

*Mr. T. F. Cornick* and *Mr. B. Williamson*, for petitioner.

*Mr. J. R. English*, for defendant.

THE CHANCELLOR.

The parties to this suit were married in Philadelphia (where the defendant resided), on the 31st of October, 1867.

The petitioner was then, and ever since has been, a resident of the city of Elizabeth, in this state. After the marriage they lived together as husband and wife, in the latter place, in a house owned by the petitioner's father, and adjoining another owned by him and in which he himself, with his wife, the petitioner's mother, lived. In the latter part of November, 1868, the defendant left her husband's house with her sister Josephine, who had been on a visit there, and returned to her father's house in Philadelphia. The immediate cause of her departure was a violent and threatening assault, which, a day or two before that time, had been made upon her and her sister by her father-in-law. It appears that an altercation had occurred between her and her mother-in-law, and that her father-in-law, in resentment at the defendant's language to his wife, came into the petitioner's house, and, using abusive and threatening language to the defendant, who was then not far from the period of her confinement, shook his fist in her face. When her sister came to her protection against violence, the old man turned against her and ordered her out of the house, and, on her refusal to leave the house, seized her by the wrists and endeavored to put her out of doors by force, although it was night and it was raining violently. The petitioner, although he was present and was appealed to, appears to have neither done nor said anything whatever to protect his wife or her sister, nor does he appear to have uttered a word of remonstrance.

The next day the defendant's father, Mr. Burton, came to the house and was informed of the occurrence of the previous evening. He spoke to the petitioner on the subject and reproached him with having denied to his wife the protection against his father's violence which, as her husband, he owed to her. To his reproachful query whether that was the care and protection which he had promised to give to his wife, the petitioner replied that he was doing the best he could, and thereupon Mr. Burton said to him : " If this is the best you can do, I will take her home and protect her."

To this the petitioner made no reply. His father then came in and went through the house to the front porch. Mr. Burton went to him there and said to him, within hearing of the petitioner: "This is a terrible state of things; if you are coming into your son's house to abuse my daughter, I will take her home and take care of her." To which the old man replied: "If she does go, she shan't take a single thing with her." Mr. Burton then told the defendant and her sister, who were both there crying, to pack up their things and go to his house in Philadelphia, and gave to Josephine money to pay the expenses of the journey, and gave them directions as to the best way to go. The petitioner said not a word. Mr. Burton then left the petitioner's house. The defendant and her sister employed the next day in making their preparations to leave. Josephine says they were engaged all day in packing their things. The day following they left the petitioner's house. When they left he was lying on a sofa. His wife kissed him and bade him good-bye; to which he made no reply. He appears to have made no objection whatever to his wife's departure. Josephine testifies that after she and the defendant had finished packing their trunk they asked him where they could find some person to take it to the railroad station, and that he gave them the name of a person whom they could employ for the purpose.

The petitioner's testimony on the subject of his wife's departure, and of the treatment which she says she received in his presence at the hands of his father, is entirely unsatisfactory. It is, as to his father's conduct towards her, of the *non mi ricordo* character. It is too much to ask the court to believe his statement that he supposed that his wife, when she went away, was going home in order that she might be confined there, and intended to return after her confinement was over. Under such circumstances he could hardly have refused to bid her good-bye, especially when she approached him with an unmistakable demonstration of affection; and yet the proof is, that when she kissed him and

bade him good-bye, he paid no attention to her. He gives as his reason, that he was "about half asleep." He subsequently, on being recalled, swears that when his wife bade him good-bye, he did not know that she was going away. There seems to be no reason to doubt that he fully knew of her intention to leave him, and the reason for it, and that he made no objection to her going, but, tacitly at least, acquiesced in it.

After her confinement he visited her at her father's house in Philadelphia. Their child died. He visited her there after that. It was not till January, 1876, that he informed her that he had ceased to regard her. This was after his father's death (of the occurrence of which it appears that the defendant was not aware until after the commencement of this suit), and a few months before this action was begun. He admits that he never told her that if she did not come and live with him he would apply for a divorce. Indeed, the the testimony shows that he furnished the defendant with money when their child was living, and there is evidence that he acquiesced in the propriety of the defendant's refusal to live with him where she would be subjected to the insults of his father. There is evidence that his father had, while she was living with her husband, insulted her otherwise than by the use of abusive language and threats of violence. He appears to have made libidinous approaches to her, which she repelled. Though this fact was not disclosed to her husband while she lived with him, her mother communicated it to him afterwards.

The petitioner relies for proof of desertion on a letter which he says was written by his wife to him in 1869, in answer to one which he wrote her requesting her to return to him. This letter from the defendant is in its tone extremely kind. The language relied upon as proof of desertion is the following:

"Your letter was received, and also the previous one; was pleased to hear from you and glad you are enjoying good health. I would have written sooner, but it was merely neglect, and would only have replied

in the negative to the questions you wished me to answer in your letters. I have nothing further to say on the subject, as I told you what my decision was when you were here."

There is nothing in this letter to contradict the defendant's statement that she was at all times willing, and so told the petitioner, to live with him, in however humble a manner it might be, provided he would furnish her a house away from his parents.   To the question put in her examination, whether, after her removal to Philadelphia, the petitioner ever requested her to return and live with him, she replied; "Not directly; he has just asked me if I would come back; my reply was, if he would get a place for me outside of his relations I would return.  He positively refused; said he could not afford it.  He knew of the conduct of his father towards me when I gave him this answer."  The petitioner, in answer to the question whether his wife ever told him that the reason she would not come back was because of the treatment she received from his father, and whether she ever asked him to protect her from his father, says that he "does not remember of her ever telling him any such thing."  To the further question, "When you asked her, after that, (when her mother told him of his father's having made dishonorable proposals to the defendant,) if she would return and live with you, did she ask you if you would protect her from your father?"  he answers: "I don't remember her asking any such question; I do not positively say she did; I don't remember making any answer to it; after I was informed of this treatment of her by my father, I don't remember saying anything to her about it; her mother did not tell me that was the reason she left; I did not at any time after that tell her I would protect her from my father if she would come back."  He alleges that the reason why she left him was because of her dislike of Elizabeth as a place of residence, and her unwillingness to bear children. She swears that she never gave either of these as her reason, and that neither of them influenced her in her determination.

The testimony in the case on which the proof of the deser-tion rests, is that of the petitioner himself, and it is uncor-roborated, except so far as the letter above referred to substantiates it. His mother's testimony, and that of Susan M. Angus, (they are the only witnesses offered by him besides himself,) are not of importance to the issue. The evidence is that the defendant left her husband's house with his full knowledge, and at least his acquiescence, if, indeed, he did not expressly indicate a willingness that she should go. He appears to have recognized the justice of her com-plaint against his father. He furnished her with some money while she was living apart from him, and he then frequently visited her at her father's house. He does not appear ever to have demanded that she should return to him. He rather seems to have acquiesced in their separation. Under such circumstances as this case presents, a divorce will not be granted. *Conger* v. *Conger,* 2 *Beas.* 286; *Gold-beck* v. *Goldbeck,* 3 *C. E. Gr.* 42; *Belton* v. *Belton,* 11 *C. E. Gr.* 449.